UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| **W. TERRENCE PENNINGTON**, | |
| Plaintiff; | Civil Action |
| v. | Case No. 17-cv-00053-JDL |
| **HANNAFORD BROS. CO., LLC**, | |
| Defendant. | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## WITH INCORPORATED MEMORANDUM OF LAW

Hannaford Bros. Co. respectfully moves for summary judgment on the basis that there are no genuine issues of material fact, and that it is entitled to judgment as a matter of law on each of the Plaintiff Terrence Pennington's claims: disability discrimination under the MHRA and ADA (Counts 1 and 5), retaliation under the MHRA and ADA (Counts 2 and 6), failure to accommodate under the MHRA and ADA (Counts 3 and 7), age discrimination under the MHRA and ADEA (Counts 4 and 8) and, finally, interference and retaliation under the FMLA and MFMLR (Counts 9 and 10.)

Pennington is the former produce manager at Hannaford's Waldoboro store. Pennington was separated from employment because Hannaford discovered—and Pennington ultimately admitted—that he was knowingly violating Hannaford's food safety rules and protocols regarding the manner in which he was packaging and code dating cut fruit and also how he had instructed his subordinates to do so in the improper manner. The issue came to light when one of the employees in the produce department was interviewing for a position at another store, and explained the way that Pennington directed associates to handle the preparation of fruit at the Waldoboro store. The deviation was considered especially serious given the fact that Pennington,

1

a department manager, was knowingly violating a food safety rule and directing associates to do the same. As such, Hannaford exercised its business judgment to end Pennington's employment.

This case reduces to a familiar issue in employment discrimination and retaliation cases: whether there is any evidence that Hannaford's reason for terminating Pennington's employment was a pretext to mask unlawful intent. As discussed below, there is no evidence of pretext, nor is there evidence that Hannaford's decision was motivated by disability discrimination, disability retaliation, FMLA retaliation, a desire to interfere with FMLA rights, or age discrimination, as Pennington contends. Accordingly, Hannaford is entitled to summary judgment on all claims.

## STATEMENT OF FACTS

Pennington was employed as the Produce Manager at Hannaford's Waldoboro store from 2000 until 2016 and also served as the food safety and workplace safety representative for the store. DSMF 1-3. During his employment, Pennington requested and was granted FMLA leaves on six occasions while employed by Hannaford prior to his most recent leave. Each time that his FMLA leave ended, Pennington returned to his previous position and was allowed to work within his medical restrictions, if any, until he returned to full time duty without restrictions. DSMF 4-5, 9.  In December 2015 and continuing until February 29, 2016, Pennington took additional FMLA leave to have shoulder surgery and to recover from that surgery.  When Pennington returned from FMLA leave on February 29, 2016 his need for leave was over and he was ready to begin work under medical restrictions that his doctor has prescribed.  DSMF 6-7.

Hannaford trains employees on food handling and safety practices involving the cutting and preparation of fruit by using Standard Practice Training Aids ("SPTA") that provide extremely detailed step by step directions. DSMF 12, 15-18. Standard Practices are created or updated through a comprehensive process that involves the review and input by all the different business

departments with the final review and approval residing within the purview of the food safety department. DSMF 13-14. There is an SPTA setting forth step by step procedures (with photos) for the preparation of each type of fruit product that is prepared and sold.   DSMF 15-18.

At Hannaford, fresh fruit is cut, packaged and dated before it is put on the sales floor and it is given a three day "sell" date.  Each SPTA specifies that once the fruit is cut, it is placed in the appropriate packaging container and then it is code dated and labeled.  DSMF 15-19.  The code date for a particular food product is established based on industry standards and manufacturer recommendations and in a manner consistent with high food safety and quality.  DSMF 22. Pennington received and placed in a binder the original SPTAs dealing with each type of cut fruit and each revision to those SPTAs.  DSMF 23.

Hannaford has a food safety and food defense policy which requires that employees follow the standard practices/SPTAs.  Pennington was aware of Hannaford's food safety and food defense policy and understood that a willful violation is considered gross misconduct sufficient for discharge without warning.  Pennington had most recently received training on the food safety and food defense policy on May 28, 2015.   DSMF 24-31.

On the night of February 23, 2016, while Pennington was still on leave, Assistant Waldoboro Store Manager, Kristen White was told by her husband - who was a manager at Hannaford's Rockland store - that an employee from the Waldoboro store (Jesse Newcomb) who was interviewing for a position at the Rockland store had described fruit preparation procedures that Newcomb said were directed by Pennington and which violated Hannaford's standard practices. In particular, Newcomb said that he had been told by Pennington that if he did not use all the fruit that he cut, to not put code dates on it and use the left over fruit the following day without

changing the date and Pennington also told him to split larger containers of sliced watermelon into smaller containers and not change the code date.   DSMF 34-37.

When White informed the Waldoboro Store Manager of this report by email on February 24, an investigation was initiated.   Associates who worked in the Produce Department were interviewed and they submitted statements about their training and the practices in cutting fresh fruit.  While some associates indicated that they were trained correctly, the information provided by two of the individuals indicated that the practices that they observed or were directed to follow by Pennington violated the Standard Practice.  DSMF 38-41; 42-49.

As a result, when Pennington completed his leave and returned to work on February 29, 2016, the Store Manager (Rick Purinton) and the Associate Relations Manager (Vickie Gammon) met with him to get his views on the alleged violations of the food safety Standard Practice. During that meeting, Pennington admitted that he sometimes cut fruit at night, stored it overnight on a tray in the refrigerated produce room and then packaged the fruit for sale the following day. Pennington told Purinton that when he would price the fruit in the morning, he would shorten the code date by a day because he had cut it the previous day.   Pennington acknowledged that he had trained his associates to do the same thing.   Pennington was fully aware of the standard practice for producing cut fruit and as indicated above he had received copies of each and every detailed SPTA.  DSMF 50-57; 23.  In short, Pennington admitted that the practices that he used and directed others to follow were in direct violation of the required step by step procedures set forth in the SPTAs because some fruit that had been cut was not being packaged and code dated right away.

The practice of not packaging and code-dating the fresh cut fruit right after it had been cut concerned Hannaford because management could not verify or determine whether fruit that had

been labeled later was actually within the authorized code date period (the date the fruit was cut plus three days) or alternatively that one day had in fact been subtracted from the date that was placed on the product if it was packaged the day after it was cut.  Hannaford management was concerned about the risk created by Pennington's deviation from the standard practice and that Pennington merely telling staff to subtract a day from the code date (when they eventually labeled the fruit) was insufficient to ensure that the fruit would actually have the correct code date.  DSMF 58-59.

Hannaford considered Pennington's knowing violations of the procedures set forth in the SPTAs to be different from and more serious than other violations that occurred due to an oversight or mistake.  Hannaford concluded that Pennington knowingly violated the SPTA requiring that fresh fruit be labeled and code dated at the time that the fruit is cut.  Pennington's actions were also viewed as dishonest. DSMF 60-62.  The decision was made to terminate Pennington's employment and he was notified of this decision on March 4, 2016.  DSMF 63-67. Hannaford has terminated other employees for intentional food safety violations. DSMF 81.

At the time Pennington went out on FMLA leave in December, 2015, the remodel and expansion plans for the Waldoboro store were still in the planning stage.  Purinton asked Pennington sometime between March and May, 2015 if Pennington could handle the new store and Pennington said he was ready.  Perry and Purinton discussed leadership competencies and qualifications for the store at the beginning of the remodel planning process and both felt that Pennington was prepared and qualified to continue as the produce manager. DSMF 68-72.

## ARGUMENT

I.   **Hannaford is entitled to Summary Judgment on Pennington's claims because Pennington cannot show he was subjected to unlawful retaliation or discrimination.**

Each claim that Pennington raises is based on the same adverse employment action: Hannaford's decision to separate Pennington from employment. Although Pennington also alleges failure to accommodate claims, those claims are still premised on the fact that Hannaford terminated his employment. So, in essence, Pennington's failure to accommodate claims are identical to his discrimination and retaliation claims, and should be evaluated as such. Pl.'s Resp. to Def.'s Rule 56(h) Memo at 8. Likewise, Pennington's FMLA interference claims are not that he was denied the opportunity to take FMLA leave, but rather that he was suspended and then terminated after his return to work from FMLA and thus was never able to work at Hannaford again. Pl.'s Resp. to Def.'s Rule 56(h) Memo at 8. *See also Germanowski v. Harris*, 854 F.3d 68, 73 (1st Cir. 2017) ("This narrowing of Germanowski's focus [from FMLA interference and retaliation to retaliation only] makes good sense because the interference claim necessarily fails if Germanowski was properly discharged.") As such, his FMLA retaliation claim and his FMLA interference claim can be reviewed co-extensively.

When a plaintiff's claim challenges an adverse employment action in a case of alleged unlawful discrimination or retaliation, a federal court considering a Rule 56 motion for summary judgment should follow the *McDonnell Douglas* burden-shifting framework. *See, e.g. Echevarria v. AstraZeneca Pharm. LP*, 856 F.3d 119, 134 (1st Cir. 2017) (ADA retaliation); *Flood v. Bank of Am. Corp.*, 780 F.3d 1, 8 (1st Cir. 2015) (MHRA discrimination); *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 104 (1st Cir. 2005) (disability discrimination); *Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 335 (1st Cir. 2005) (FMLA and MFMLR interference and retaliation); *Boyajian v. Starbucks Corp.*, 587 F. Supp. 2d 295, 304 (D. Me. 2008) (ADEA and MHRA discrimination). That framework has been described as follows:

> The *McDonnell Douglas* framework is a three-step procedure. First, a plaintiff employee must carry the initial burden of coming forward with sufficient

> evidence to establish a prima facie case of discrimination or retaliation. ... If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the termination. If the employer can proffer evidence sufficient to raise a genuine issue of fact as to whether it discriminated against the employee ... the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating him was in fact a pretext for retaliating against him for having taken protected FMLA leave.

*Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 69 (1st Cir. 2015) (internal quotations and citations omitted).

### A.    Hannaford has offered a legitimate, non-discriminatory reason for Pennington's termination.

Pennington cannot prove that Hannaford's decision to terminate his employment was a pretext to mask unlawful discrimination or retaliation.  Hannaford does not dispute, for summary judgment purposes only, that Pennington can meet the first step of making a prima facie case of his claims, as that phrase has been used by federal courts when applying *McDonnell Douglas*. Hannaford has met its burden at the second step—offering a lawful reason for its action—by producing evidence that Pennington was terminated for violating food safety rules. *See, e.g. Dyer v. Wal-Mart Stores, Inc.*, 2017 WL 2213570 (E.D. Mich. May 19, 2017). Thus, the analysis turns to the third step: whether Pennington can show that the proffered reason for his termination was a pretext to cover up unlawful retaliation or discrimination.

### B.    Pennington cannot show that Hannaford's reason for terminating him is a pretext to mask unlawful discrimination or retaliation.

As the First Circuit has explained, "[i]n assessing pretext, a court's focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible." *Mesnick v. Gen. Elec. Co*., 950 F.2d 816, 824 (1st Cir. 1991) (internal quotations omitted); *see also Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 246 (1st Cir. 2006). A plaintiff must do more than "merely to impugn the veracity of the employer's justification; he must

7

elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive[.]" *Id.* (internal quotations omitted). "At a minimum, the plaintiff must 'adduce some significantly probative evidence that the [defendant's] retaliatory animus played a materially causal role in the termination of [his] employment.'" *Murray v. Kindred Nursing Centers W. LLC*, 789 F.3d 20, 28 (1st Cir. 2015) (quoting *Kearney v. Town of Wareham,* 316 F.3d 18, 19 (1st Cir.2002)).   Pennington cannot meet this standard.

### i.      Hannaford reasonably concluded, as evidenced by Pennington's own admissions, that Pennington was knowingly violating food safety rules.

Courts are mindful that a violation of work rules, and particularly safety rules, is a legitimate, nondiscriminatory reason to terminate an employee, even if the employee denies the violation or attempts to downplay its significance.[1] For instance, in *Morton v. Shearer's Foods*, the employee was terminated for improperly verifying a failed metal detector test in violation of company policy.   No. 1:14CV00047, 2015 WL 5278375, at *6 (W.D. Va. Sept. 8, 2015).   The employee was responsible for overseeing food safety at a potato chip processing facility by,

---

[1] *See, e.g. Damon v. Fleming Supermarkets Of Florida, Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct.");  *Gray v. Masterfoods USA*, 304 F. App'x 611, 612 (9th Cir. 2008) (employee's failure to follow "lock out/tag out" safety procedure was a legitimate non-discriminatory reason for termination and employee failed to identify evidence that reason was pretextual); *Morton v. Shearer's Foods, LLC*, No. 1:14CV00047, 2015 WL 5278375, at *6 (W.D. Va. Sept. 8, 2015), *aff'd sub nom. Morton v. Shearer's Foods*, 669 F. App'x 698 (4th Cir. 2016) (termination of employee for violating food safety rules by verifying a failed metal detection test was a legitimate nondiscriminatory reason for termination); *Dyer v. Wal-Mart Stores, Inc.*, No. 16-CV-12496, 2017 WL 2213570, at *5 (E.D. Mich. May 19, 2017)  (concluding employee was terminated because of violations of food safety procedures and disrespectfulness toward fellow employees and crediting employer's thorough, neutral, and deliberative investigation into the alleged misconduct); *Peterson v. Exide Techs.*, 477 F. App'x 474, 477-78 (10th Cir. 2012) (employee's repeated failure to operate forklift in a safe manner was a legitimate nondiscriminatory reason for termination and the fact the violation was "minor" insufficient to establish the reason was mere pretext); *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1291 (10th Cir. 2007) ("There is no evidence that Campbell received the corrective action form or had her unit secretary and inventory technician duties removed in retaliation for taking FMLA leave. Instead, those actions were taken in response to her undisputed violations of Gambro policy, which came to light while she was on leave.").

among other things, performing regular tests on metal detectors to screen for foreign objects in bags of chips. *Id.* at *1. The termination occurred three days after the violation occurred and two days after the employee requested FMLA leave. *Id.* at *4. The court concluded that the employer had put forth a legitimate, non-discriminatory reason for terminating the employee—violation of company policy and food safety standards—and that the employee failed to put forth evidence that the individuals responsible for her termination decision invented the reason as a pretext. *Id.* at *6. The court concluded the employee failed to show that a similarly-situated employee had been treated differently, citing evidence that other employees had been disciplined for food safety violations. *Id.* at *7. The court noted that the temporal nexus of several days between her FMLA request and termination, without more, was insufficient to generate a disputed issue of material fact as to pretext. *Id.*

Similarly, in *Dyer v. Wal-Mart Stores, Inc.*, the employee was terminated primarily for violating food safety procedures two months after requesting FMLA leave. No. 16-CV-12496, 2017 WL 2213570, at *5 (E.D. Mich. May 19, 2017). The employee had previously received a written warning when it was discovered that she failed to remove expired product from the deli department. *Id.* *2. The employer later received an anonymous tip that the employee had falsified expiration dates on food items and had failed to properly wash her hands and cross-contaminated food. *Id.* Associates, in employer investigative interviews, confirmed that the employee had mixed old product with new and falsified salad expiration dates. *Id.* The decision was made to terminate the employee. *Id.* at *3. The court concluded that summary judgment was appropriate because the two month temporal proximity between the FMLA request and the termination was insufficient to establish pretext. *Id.* at *5. The court rejected the employee's

contentions that the food safety complaints were a conspiracy against her because there was no evidence that the employees that made the reports did so in retaliation for her FMLA request. *Id.*

Here, Hannaford's investigation concluded that Pennington knowingly committed a food safety violation and that, based on company policy and past practices of handling similar conduct, that termination was appropriate. DSMF 58-67, 81. Although it is anticipated that Pennington may dispute the facts uncovered during the investigation and claim that Pennington's conduct was a technical violation of the relevant policies, those disputes do not establish pretext and thus are not ultimately material. The undisputed facts establish that Hannaford conducted an investigation (including an interview of Pennington) that concluded Pennington committed a willful violation of a food safety policy. This determination, not discrimination or retaliation, led to Pennington's termination. Even accepting any contentions by Pennington about the soundness of the investigation, any such purported factual disputes are insufficient as a matter of law to establish pretext because the material facts—that Pennington failed to immediately code date fruit and admitted doing so and admitted instructing others not to do so—are undisputed. *See Bonefont-Igaravidez v. Int'l Shipping Corp.*, 659 F.3d 120, 124–25 (1st Cir. 2011) (disputing the truth of tangential aspects of the employer's story is insufficient to show pretext).

As noted above, the issue of pretext requires the court to focus upon "the perception of the decisionmaker." *Azimi*, 456 F.3d at 246. The court may not second-guess the employer's decision; the inquiry is not whether the investigation relied on information that was objectively accurate, or whether the employer properly applied the relevant policy, the issue is "whether the employer believed its stated reason to be credible . . . ." *Id.* "Whether a termination decision was wise or done in haste is irrelevant, so long as the decision was not made with discriminatory animus." *Rivera-Aponte v. Rest. Metropol #3, Inc.*, 338 F.3d 9, 11 (1st Cir. 2003); *see also*

*Reynolds v. Chipotle Mexican Grill, Inc.*, 120 F. Supp. 3d 704, 723 (S.D. Ohio 2015) ("The court should not second-guess an employer's termination decisions so long as they are honestly based upon particularized facts regarding the employee's performance. That decision can be shown to be factually incorrect or even unfair, but a plaintiff must do more than identify a factual error or assert unfairness."); *Mercer v. Arc of Prince Georges Cty., Inc.*, 532 F. App'x 392, 399 (4th Cir. 2013) ("[T]he Court's task is not to decide whether the reason [for termination of employment] was wise, fair, or even correct, ultimately, so long as it truly was the reason for [the decision]."); *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285–86 (6th Cir. 2012) ("[T]he employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless."); *Peterson v. Exide Techs.*, 477 F. App'x 474, 478 (10th Cir. 2012). "In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807–08 (6th Cir. 1998).

The thoroughness of Hannaford's investigation, evidenced by contemporaneous emails and written statements from employees and admissions by Pennington, along with a review of the procedures required by the SPTAs, and the thoughtful decision making process after speaking with the relevant parties, some multiple times, demonstrates no evidence of pretext. DSMF 34-49; 50-57.  The investigation happened to be launched while Pennington was on leave but only because it was at that time that associate Jessie Newcomb, during an interview at another store, revealed the information about code dating practices that violated policy. DSMF 34-35.

11

The investigation consisted of interviews with existing employees, two of whom confirmed verbally and in their own written statements that Pennington was violating the SPTAs by not code dating the fruit after it was cut.  DSMF 40-49.  Most importantly, however, when Pennington returned from leave, he was interviewed.  In the course of that process, Pennington admitted to practices that he used and that he also directed employees to use that violated the SPTA's.  Although the SPTAs do not provide for it, Pennington decided that instead of packaging and code dating all the fruit that had been cut, sometimes he would place the leftover fruit in the cooler overnight and then prepare additional fruit products with it the next day. DSMF 52-57.  Pennington did this even though he was keenly aware of the procedures in the SPTAs (including having copies of each and every one of them) and yet he did not follow those procedures.  DSMF 23, 57, 19.

Even if Pennington were to claim that he was unaware of the overall procedures, he repeatedly conceded that he was aware that the procedures require that you cut the fruit and give it a three day sell by date.  As a result, every time that he labeled the fruit less than three days to make up for the fact that the fruit was cut on the previous day, he was once again, knowingly violating the SPTA procedures.  Based on Pennington's admissions, the other facts, and after reviewing the SPTA procedure, Perry ultimately decided that termination was appropriate.

As noted above, there is abundant authority supporting the lawfulness of terminating an employee for violating an employer policy.  Pennington's violation was considered particularly serious because it involved food safety—a paramount concern for Hannaford's business—and involved willful/intentional conduct by an employee who not only understood the policy, but was responsible for food safety at the store.  DSMF 3; 25. This violation is therefore categorically more serious than the ordinary food safety issues that arise from employee negligence, omissions

or mistakes; this was a deliberate decision not to label a fruit product upon cutting.  DSMF 58-62.

Finally, Hannaford considered the practice of intentionally failing to label as required by the SPTA to be dishonest, an additional non-retaliatory reason to terminate.  DSMF 62.  *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 284 (6th Cir. 2012) ("Fraud and dishonesty constitute lawful, non-retaliatory bases for termination."); *Street v. Kraft Foods, Inc.*, 221 F.3d 1344 (8th Cir. 2000) (unpublished) (employer properly granted summary judgment where the evidence established that employee was terminated because he failed to make a scheduled driving run, lied to a supervisor, and falsified logs or trip sheets and employee failed to establish pretext); *Spring v. Sealed Air Corp.*, 483 F. App'x 765, 769 (3d Cir. 2012).

### ii.   Hannaford views intentional food safety violations as a gross misconduct warranting termination.

With respect to the preparation, cutting and packaging of fruit, Hannaford prepared individual SPTAs for each type of fruit product, each of which contained detailed, step by step directions with photographs that meticulously walk an associate or manager through each phase of the fruit preparation process. DSMF 15-21.  A simple review of the SPTA documents reveal the care that was taken by Hannaford to provide their employees with extremely detailed directions.   Importantly, these documents (SPTAs) are the product of a comprehensive, detailed and substantive preparation and review process involving numerous departments at Hannaford and culminate with a review by the food safety department.  Based on this approach, the specific directions on food preparation contained therein are extremely well developed with clear purposes.  DSMF 13-14.

The food safety and defense policy requires that employees follow the SPTAs.  The directives in the policy in this regard are clear and unambiguous: "…[M]ost of us are directly

involved with the handling of food, and ***must take specific precautions*** to maintain the safety and integrity of the food.  These precautions are ***spelled out in standard practices*** and training programs." DSMF 27 (emphasis added).   The policy further provides:  "[f]ailure to comply with our food safety and food handling standard practices …. may compromise the quality of the food for our customers.  Willfull violations of our Food Safety & Defense Policy are considered gross misconduct sufficient for discharge without warning, in accordance with the personal behavior policy." DSMF 24-29.

As the Director of Operations Tom Perry testified, without strict adherence to the SPTAs on cut fruit (and in particular the code dating at the conclusion of that process), neither he nor any member of management can be sure of the accuracy of any date that is placed on the fruit.  From Hannaford's perspective, unless the fruit is code dated after it is cut, a risk of inaccuracy in code dating is created particularly when it is stored and then packaged on a different day.  DSMF 58-59.

A review of the SPTAs for each type of cut fruit makes clear that the uniform approach to the preparation of fruit based on such detailed step by step directions which have been thoroughly vetted by all departments at the Company (including the food safety department) provides an important framework for food safety.  DSMF 12-14; 15-19.  Deviations from that approach and in particular with respect to code dating opens the Company up to a risk of the possibility of incorrect or inaccurate code dates.   Because those code dates are established based on industry standards and manufacturer recommendations as well as Hannaford's high standards for food safety and quality, any potential deviation from those dates exposes the Company and the customer to risk of a product that does not satisfy the Company's expectations and

requirements. DSMF 22; 58-59.  Given the importance of food safety, the Director of Operations determined that such a risk was unacceptable.

Importantly, Pennington was trained on the food safety and defense policy as recently as May, 2015, he admittedly received and placed into a binder each and every SPTA and any revisions thereto on each type of cut fruit, and he understood the sequential process for fruit preparation that culminated with the packaging and code dating after the fruit had been cut and prepared.  DSMF 25, 31, 19, 23.  Notwithstanding, these facts and the excruciating detail of the SPTA's, Pennington opted to deviate from those directions and store some cut fruit overnight and use it the next the day.  Equally important, he chose to direct his associates to do the same. DSMF 55-56.  Although he may have thought that he was achieving the same objective as dictated by the three day "sell by" requirement by eliminating one day from the code date when he prepared the fruit the next day, his approach was inconsistent with the directions in the SPTAs.  In essence, Pennington was adding a new and different procedure to the process detailed in the SPTA of storing the cut fruit in a cooler for a day – which is a procedure that was neither reviewed nor approved by the food safety department or any other department.  As a result, his admitted actions in that regard are in direct violation of the SPTAs and as a result they are also in violation of the food safety and food defense policy.

The manner in which Hannaford has addressed other employees who knowingly violated food safety policies also undermines Pennington's pretext argument.  *Tobin*, 433 F.3d at 105-106.  In particular, Hannaford has terminated other employees for similar or lesser intentional food safety violations such as the following (DSMF 81):

> a.  On April 28, 2014, Hannaford terminated a produce manager for having instructed associates in her department that they did not need to perform temperature checks on fresh cut fruit and instead they could simply write down on a log an acceptable temperature number.

b.  On July 10, 2014, Hannaford terminated a deli service leader for having told other associates to enter temperatures in a temperature log for a hot food cart that they made up.

c.  On July 29, 2014, Hannaford terminated an associate who had entered a temperature on the temperature log for the hot soup even though she had not actually checked the temperature.

d.  On September 30, 2014, Hannaford terminated a meat/seafood manager for having kept an out of date frozen meat product in the freezer to eventually sell to a particular customer.

e.  On May 4, 2015, Hannaford terminated a meat manager for having instructed an associate to label certain ground beef that had tested as 78% beef as being 80%.

f.  On September 4, 2015, Hannaford terminated a deli manager for having entered temperatures on a temperature log for a hot food cart that she made up.

g.  On October 15, 2015, Hannaford terminated a manager trainee for having instructed an associate to put outdated product into the butcher shop.

h.  On February 8, 2016, Hannaford terminated a deli associate for having written down temperatures on a refrigerated food products temperature log even though she had not actually taken the temperatures.

i.  On March 27, 2012, Hannaford terminated a meat department manager as a result his actions in brining beef in the meat department.

j.  Pennington also had a friend who was fired by Hannaford for regrinding meat about 15 years ago.

While there is a critical distinction between *intentional* food safety violations and *inadvertent and/or unintentional* omissions and mistake, these situations demonstrate that Hannaford approaches intentional food safety violations in a serious manner just as it did in the case of Mr. Pennington.   Hannaford's policies are consistent with this approach:  the food safety policy specifies that a violation may result in termination; the personal behavior policy does as well and the performance counseling policy also recognizes that serious misconduct (such as a

16

violation of the food safety policy) may result in immediate termination.   Importantly, Mr. Pennington was aware of and understood these policies.   From Hannaford's perspective, the knowing violation of the policy by Pennington was an important distinguishing feature which supported the termination decision in this case.

> ### iii. Pennington is not insulated from discipline because he was on FMLA leave when his misconduct was discovered, and there is no evidence suggesting retaliatory or discriminatory animus played any role in Hannaford's decision.

The fact that Pennington was on FMLA leave when the violation was uncovered and the investigation was initiated does not prevent Hannaford from taking appropriate disciplinary action.   The distinction between terminating an employee because he took FMLA leave and terminating an employee for misconduct that happened to be discovered while he was on FMLA leave is critical. *See Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 155 (3d Cir. 2017) (affirming summary judgment in favor of the employer, holding that employer's belief that employee was misusing FMLA, even if mistaken, was insufficient to find pretext); *Szostek v. Drexel Univ.*, 597 F. App'x 50, 53 (3d Cir. 2015) ("Supervisors testified that Szostek was terminated because they believed he had dishonestly called out on FMLA when he was no longer eligible. If so, then this was no mere pretext for firing him.").

It is not unusual, as occurred here, for an employer to discover violations of employer policy while an employee is out on leave. "While an employee may not be penalized for exercising her rights under the statute, an employee may nevertheless be discharged, not promoted, or denied benefits for independent reasons during or after her taking of FMLA leave." *Carrero-Ojeda v. Autoridad de Energia Electrica*, 755 F.3d 711, 719 (1st Cir. 2014).   "[T]he FMLA does not protect an employee from discharge for any reason . . . ."   *Id.* at 722.   "In an FMLA retaliation case, the employer's intent—*i.e., why* the employer fired or acted against the

employee—matters." *Id.* at 719.  For instance, in *Campbell v. Gambro Healthcare*, after the employee left on FMLA leave in October 2003, substitute employees assumed her inventory and secretary duties.  478 F.3d 1282, 1285 (10th Cir. 2007).  It was soon discovered that there was a significant financial discrepancy in the inventoried materials and that a large backlog of patient records had piled up in the employee's office—both violations of employer policy.  *See id.*  The employee returned from FMLA leave on January 5 and was terminated January 9, with the employer citing her failure to perform her inventory duties and to properly notify the employer of an October absence.  *See id.* at 1286.  The Eleventh Circuit affirmed summary judgment in favor of the employer, concluding that the employee failed to meet her burden to show pretext— there was no evidence that her termination was in retaliation for taking FMLA leave.  *Id.* at 1291.  Instead, the court concluded she was terminated for violations of employer policy and failure to perform duties. *Id.*

The above case law highlights the fact that when an employee's termination *coincides* with FMLA leave it does not mean that the termination was *the result of* FMLA leave.   If there is any legitimacy to the First Circuit's language that "the FMLA does not protect an employee from discharge for any reason[,]" and an employee may be discharged "for independent reasons during or after her taking of FMLA leave," *Carrero-Ojeda v. Autoridad de Energia Electrica*, 755 F.3d 711, 719 (1st Cir. 2014), then the fact that Hannaford's discovery of the misconduct occurred while Pennington was on FMLA leave cannot be construed as evidence of pretext. [2]

Ultimately, the plaintiff-employee has the burden to produce evidence that the termination was causally related to a retaliatory or discriminatory motive. Pennington has not

---

[2] The Court also noted that "while temporal proximity is one factor from which an employer's bad motive can be inferred, by itself, it is not enough—especially if the surrounding circumstances undermine any claim of causation." *Carrero-Ojeda*, 755 F.3d at 720.  Here, the surrounding circumstances clearly undermine the claim that discriminatory or retaliatory animus.

done so.   The only evidence Pennington might point to is a single isolated comment by Rick Purinton approximately 10 to 12 months before the termination decision asking Pennington whether he could "handle" the upcoming store expansion.  This single comment is insufficient given the lack of temporal proximity and particularly when placed into context.  *See Lehman v. Prudential Ins. Co. of Am.*, 74 F.3d 323, 329 (1st Cir. 1996) ("Isolated, ambiguous remarks are insufficient, by themselves, to prove discriminatory intent.").  The upcoming expansion was to increase not only the size of the store, but the number of people, variety of product, as well as a number of other changes.  DSMF 68-72.  There is no evidence that it was directed to his age, medical issues or physical capabilities, let alone his use of FMLA leave.  Nor is there any evidence linking the comment to the ultimate termination decision.

Pennington has offered no evidence that he was retaliated against or discriminated against because he is disabled, because he had taken FMLA leave, or because of his age. In fact, with respect to the FMLA claims, his disability based retaliation claims, and his age discrimination claim, Pennington had taken six previous FMLA leaves (including one for 3 months in early 2015) without incident and his job duties had been regularly modified upon his return from those absences until he received medical clearance for full duty.  Such past supportive treatment undermines any claim of animus in any regard.  *Henry v. United Bank,* 784 F. Supp. 2d 68, 75 (D. Mass. 2011), *aff'd,* 686 F.3d 50 (1st Cir. 2012) (summary judgment for employer on handicap discrimination where employer had made accommodations in past). [3]

On this record, a factfinder would have to engage in speculation to conclude that Hannaford's reason for terminating Pennington's employment was a pretext to mask

---

[3] See Also, *Henson v. U.S. Foodservice, Inc.*, 588 F. App'x 121, 126 (3d Cir. 2014) (noting that plaintiff's prior requests for FMLA were approved on numerous occasions over several years without any negative consequence); *Rensink v. Wells Dairy, Inc.*, 741 F. Supp. 2d 1038, 1063 (N.D. Iowa 2010) (finding evidence of a causal relationship between termination and FMLA leave "weak" and unpersuasive where employee sought and was approved for FMLA leave over several years).

discriminatory or retaliatory intent. *See Azimi*, 456 F.3d at 241 ("Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." (quotation marks omitted)).

In addition, to the extent that the FMLA interference claim is argued to be separate from the retaliation claim, it still fails. Pennington conceded at his deposition that he was allowed to complete his entire FMLA leave and he had successfully returned to work before he was questioned. This was the same treatment he received on his six previous FMLA leaves. Because he admittedly had unimpeded access to all the FMLA leave to which he was entitled, his claim fails. *Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325,330-331 (1st Cir. 2005)(discussing distinction between FMLA interference and FMLA retaliation claims).

Finally, as for his age discrimination claim, it is settled that "The employee bears the burden of proving that age was the but-for cause of his termination." *Adamson v. Walgreens Co.*, 750 F.3d 73, 78 (1st Cir. 2014). As indicated above, there is no evidence of pretext and certainly no evidence that age was the "but-for" cause for his termination.

## CONCLUSION

For the reasons set forth above, Hannaford respectively submits that it is entitled judgment as a matter of law on each claim advanced in this matter.

Respectfully submitted by,

Dated: February 9, 2018          /s/ Timothy J. O'Brien
                                 Timothy J. O'Brien, Esq. (Bar No.3799)
                                 Attorney for Defendant
                                 Libby O'Brien Kingsley & Champion, LLC
                                 62 Portland Road, Suite 17
                                 Kennebunk, ME  04043
                                 tobrien@lokllc.com
                                 (207) 985-1815

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

> Chad T. Hansen
> Maine Employee Rights Group
> 92 Exchange Street 2nd floor
> Portland, Maine 04101
> chansen@maineemployeerights.com

Dated: February 9, 2018                           /s/ Timothy J. O'Brien
                                                                  Timothy J. O'Brien, Esq. (Bar No.3799)
                                                                  Attorney for Defendant
                                                                  Libby O'Brien Kingsley & Champion, LLC
                                                                  62 Portland Road, Suite 17
                                                                  Kennebunk, ME  04043
                                                                  tobrien@lokllc.com
                                                                  (207) 985-1815