UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| **W. TERRENCE PENNINGTON**       )<br>                                                             )<br>           Plaintiff,                          )<br>                                                             )<br>      v.                                              )     Dkt. No. 17-cv-00053-JDL<br>                                                             )<br>                                                             )<br>                                                             )<br>                                                             )<br>**HANNAFORD BROS. CO., LLC**    )<br>                                                             )<br>           Defendant.                      )     | |

# DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendant Hannaford Bros. Co. ("Hannaford" or "Defendant"), offers the following undisputed statement of material facts in support of its Motion for Summary Judgment. For ease of reference, the ECF Page ID numbers for the deposition transcripts in the Stipulated Record are as follows:

| | |
|---|---|
| Terrence Pennington Deposition Transcript | PageID #129-168 |
| Thomas Perry Deposition Transcript | PageID #169-220 |
| Richard Purinton Deposition Transcript | PageID #221-326 |
| Kristin White Deposition Transcript | PageID #327-368 |
| Ken Kierstead Deposition Transcript | PageID #369-393 |
| Vicky Gammon Deposition Transcript | PageID #394-416 |
| Cynthia Burk Deposition Transcript | PageID #417-444 |
| Wayne Mello Deposition Transcript | PageID #445-478 |

## Background and FMLA Leave

1. Plaintiff W. Terrence Pennington ("Pennington") began working as the Grocery Manager of the Waldoboro Hannaford on March 30, 1994. Compl. ¶ 17; Dep. Ex. 34 ¶2, PageID#693.

2. From 2000 until 2016, Pennington was employed as the Produce Manager. Dep. Ex. 34, ¶3, PageID#693.

3. Pennington also served as the food safety and workplace safety representative for the store and conducted monthly audits of the store. Pennington Dep. 31:11-32:8.

4. During his employment, Pennington requested and was granted FMLA leaves on six occasions while employed by Hannaford prior his most recent leave from December, 2015 through February, 2016 (Pennington Dep. 23:9-19; 85:11-18):

    a. In 1998, Pennington took leave after suffering a heart attack. Pennington Dep. 7:25-9:1; Dep. Ex. 27. PageID#645-647.

    b. In 2001, Pennington took leave to have back surgery and needed three months to recover. Pennington Dep. 24:9-25:22.

    c. In 2011, Pennington took leave to recover from a knee injury. Pennington Dep. 9:9-10:19; Dep. Ex. 28, PageID#648-653.

    d. In 2012, Pennington took two different leaves to related to a back injury and surgery. Pennington Dep. 10:22-14:23; Dep. Exs. 29, 30, PageID#654-659 and 660-667.

    e. In January 2015, Pennington took leave related to a shoulder injury. Pennington Dep. 15:5-17:3; Dep. Ex. 31, PageID#668-682.

5. Each time that his FMLA leave ended, Pennington returned to his previous position and was allowed to work within his medical restrictions, if any, until he returned to full time duty without restrictions. Pennington Dep. 8:11-9:6 (1998); 24:25-25:21 (2001); 10:8-19 (2011); 12:16-13:9 (2012); 14:9-15:2 (2012); 15:12-17:23 (2015).

6. In December 2015 and continuing until February 29, 2016, Pennington took additional FMLA leave to have shoulder surgery and to recover from that surgery. Pennington Dep. 18:1-25; Ex. 32, PageID#683-690.

7. When Pennington returned from FMLA leave on February 29, 2016 his need for leave was over and he was ready to begin work under medical restrictions that his doctor has prescribed.  Pennington Dep. 86:7-14.

8. Pennington received all the FMLA leave from Hannaford that he wanted whenever he needed it.  Pennington Dep. 87:16-21.

9. Pennington agrees that he was reinstated to his previous position every time he took a leave except for the last time.  Pennington Dep. 86:1-3.

10. Pennington agrees that every time he needed a period of time to work within certain medical restrictions, Hannaford allowed him to work within those restrictions in accordance with his doctor's recommendation, except for the last time.  Pennington Dep. 85: 19-25.

11. Pennington received "Meets All Expectations" annual performance reviews for his work from 2010 to 2015.  Purinton Dep. 81:14-96:22; Dep. Ex. 1-5, PageID#479-486, 487-494, 495-503, 503-511, 512-518, 519-525.

**Food Safety Policy and Procedures**

12. Hannaford trains employees on food handling and safety practices involving cut fruit by using Standard Practice Training Aids ("SPTA") that provide step by step directions. Mello Dep. 49:5-16.

13. Standard Practices are created or updated through a process that involves the review and input by all the different business areas and the final review and approval process is from the food safety department. Mello Dep. 38:3-39:2

14. For example, if the department that is initiating the change or new practice is the produce department, the produce and merchandizing departments would prepare the initial proposal or revision and then it would be reviewed by the workplace safety department, the labor department, the product safety department and other departments and ultimately after that review process it would go to the food safety department for review and approval as the final step in that process. Mello Dep. 39:3-14.

15. There is an SPTA setting forth step by step procedures for the cutting and packaging of each fruit product that is prepared and sold. Pennington Dep. 32:16-33:5.

16. The expiration/code date for fresh cut fruit is the date the fruit is cut plus three days. Pennington Dep. 56:23-57:6; 65:11-13; 66:17-19; 67:17-20; 71:19-23; 77:14-78:6.

17. At Hannaford, fresh fruit is cut, packaged and dated before it is put on the sales floor and it is given a three day sell by date. Pennington Dep. 21:1-12; 77:14-78:10; Dep. Ex. 10, PageID#534-539.

18. The SPTA for each type of fruit has step by step instructions (with photos) which indicate that once the fruit is cut, it is placed in the appropriate packaging container and then it is code dated and labeled. Pennington Dep. 55:22-57:9 (cut watermelon); 57:19-59:10 (watermelon cups); 59:20-61:1 (berry medley cups); 62:14-63:8 (strawberry cream parfait); 63:13-65:13 (basic fruit salad); 65:18-66:19 (traditional fruit salad); 66:20-67:20 (strawberry kiwi cups); 68:24-69:20 (strawberry yogurt

cup); 70:2-70:15 (blueberry yogurt granola cup); 70:23-71:23 (berry platter); 72:9-73:5 (fruit platter); 76:4-9 (lunch box snacks); 6:16-23 (tri-pack of strawberry, honeydew and pineapple); 77:4-9 (tri-pack of strawberries, red grapes and green grapes)  Dep. Ex. 38 (2013 SPTAs), PageID#722-766; Dep Ex. 39 (2014 SPTAs), PageID#777-822; Dep. Ex. 40 (2015 SPTAs), PageID#823-894.

19. The last preparation steps with respect to each fruit item involves placing the fruit in the container, placing the container on the scale to weigh it, generating a label for the container which would set forth the code date that the fruit was cut plus 3 days that it would be available for sale and then the product was ready for sale.  Pennington Dep. 77:14-78:10; Mello Dep. 46:4-5; 54:6-10; 57:18-22.

20. The steps in the SPTA are meant to be followed one after the other; you follow the flow of the steps, and there is no provision allowing for the temporary storage of cut fruit so that it can be packaged and labeled for sale later.  Mello Dep. 45:11-46:19; 52:25-54:15; Perry Dep. 111:22-113:5; 115:20-116:11; Purinton Dep. 118:10-20.

21. If you follow the flow of the steps, there is nothing in the standard practice that would allow you to later open the container and break it down further.  Mello Dep. 55:12-56:22; 57:11-22.

22. The code date for a particular food product is established based on industry standards and manufacturer recommendations and in a manner consistent with high food safety and quality.  Mello Dep. 47:13-14; 64:17-65:4.

23. Pennington received and placed in a binder each original SPTA dealing with cut fruit and each revision to those SPTAs.  Pennington Dep. 33:6-34:18.

24. Hannaford has a food safety and food defense policy which requires that employees follow the standard practices ("SPTA's"). Purinton Dep. 256:12-257:18; Dep. Ex. 7, PageID#527-529; Pennington Dep. 49:14-50:16.

25. Pennington was aware of Hannaford's food safety and food defense policy. Pennington Dep. 49:2-17; Dep. Ex. 7, PageID#527-529.

26. Hannaford has a personal behavior policy that specifies that a violation of the food safety and food defense policy will subject the employee to discipline up to and including termination. Mello Dep. 22:12-23:6; Dep. Ex. 25, PageID#634, para. D; Pennington Dep. 50:22-51:13; Purinton Dep. 257:21-258:25.

27. Hannaford's Food Safety and Food Defense policy reads in part: "And in fact, most of us are directly involved with the handling of food, and must take specific precautions to maintain the safety and integrity of the food. These precautions are spelled out in standard practices and training programs." Dep. Ex. 7, PageID#527, second paragraph.

28. In addition, the policy provides that "[f]ailure to comply with our food safety and food handling standard practices …. may compromise the quality of the food for our customers. Willfull violations of our Food Safety & Defense Policy are considered gross misconduct sufficient for discharge without warning, in accordance with the personal behavior policy." Dep. Ex. 7, PageID#527, sixth full paragraph.

29. In its non-exhaustive list of inappropriate acts where a violation may result in disciplinary action, up to and including termination, the Food Safety and Food Defense policy states that "Management's failing to require that associates are trained

6

on the Food Safety and Food Defense Policy prior to working and handling food." Dep. Ex. 7, PageID#529, last bullet point.

30. Pennington understood that a willful violation of Hannaford's food safety and food defense policy is considered gross misconduct sufficient for discharge without warning in accordance with the personal behavior policy. Pennington Dep. 50:7-16; Dep. Ex. 7, PageID#527, sixth full paragraph.

31. Pennington received training on the food safety and food defense policy on May 28, 2015. Pennington Dep. 48:4-18; Dep. Ex. 6, PageID#526.

32. Hannaford has a performance counseling policy that specifies that in cases of serious misconduct, Hannaford may proceed to suspension or termination without any prior documented counseling sessions. Purinton Dep. 237:4-238:8; Dep. Ex. 24, PageID#631.

33. Pennington acknowledged that Hannaford's performance counseling policy allows Hannaford to move ahead of the "step" process with the level of discipline in cases of serious misconduct. Pennington Dep. 53:18-55:2; Dep. Ex. 24, PageID#631.

### Discovery of Violation and Investigation

34. On the night of February 23, 2016, Assistant Waldoboro Store Manager Kristen White ("White") was told by her husband who was a manager at the Rockland store that an employee from the Waldoboro store (Jesse Newcomb) who was interviewing for a position at the Rockland store had described fruit preparation procedures that violated Hannaford's standard practices. White Dep. 52:10-56:9; Dep. Ex. 11, PageID#550.

7

35. White's husband is the Produce Manager of the Hannaford store in Rockland and conducted the interview. White Dep. 56:24-25.

36. Based on what White's husband told her, during that interview Newcomb revealed that Pennington told him that if he did not use all the fruit that he cut, to not put code dates on it and use it the following day without changing the date. White Dep. 52:20-53:1.

37. White was also told that Newcomb stated that Pennington told him to split larger containers of sliced watermelon into smaller containers and not change the code date. White Dep. 53:19-25; Dep. Ex. 11, PageID#550; Purinton Dep. 134:7-10.

38. The following morning on February 24, 2016, White emailed Store Manager Rick Purinton ("Purinton") and Vicky Gammon regarding the code dating practices that she had just found out about. White Dep. 57:15-25; Dep. Ex. 11, PageID#550.

39. In response, management initiated an investigation into the matter. Purinton Dep. 145:7-16; Perry Dep. 80:21-83:20, 106; White Dep. 60:17-61:8.

40. Associates who worked in the Produce Department were interviewed and they submitted statements about their training and their practices in cutting fresh fruit. Purinton Dep. 145:7-148:4; Perry Dep. 83:10-85:24; White Dep. 61:17-64:16, 96:20-100:8; Dep. Ex. 14 (PageID#617-621); 16 (PageID#623); 17 (PageID#624); 18 (PageID#625); 19 (PageID#626); 20 (PageID#627); 21 (PageID#628); 22 (PageID#629); 23 (PageID#630).

41. While some associates indicated that they were trained correctly, two (Newcomb and Cindy Burk) indicated to White that they had been asked to extend code dates. White Dep. 72:2-73:12.

42. The store management sought guidance from the Associate Relations Specialist for the area in which the store was located (Ken Kierstead) who suggested that they get more clarifying statements from each associate and those statements were subsequently obtained.  White Dep. 73:13-74:8.

43. White summarized the results of the discussions with and statements from some of the associates in different emails.  White Dep. 89:6-93:3; 94:16-98:25; 99:11-101:8; Dep Ex. 14, PageID#617-621.

44. Associate Dave said that they put the code date on the package when the fruit was cut.  White Dep. 101:9-102:18; 106:25-110:12; Dep. 16, PageID#623.

45. Associate Zach recalled that he was told to cut the fruit in advance so that it would be easier to make the next day, but he could not remember what direction he received on when to date it.  White Dep. 102:19-103:12; Dep. Ex. 17, PageID#624.

46. Associate Dan indicated that the fruit was code dated when it was cut.  White Dep. 103:13-104:13; Dep. Ex. 18, PageID#625.

47. Associate Cindy Burk indicated that Pennington would take containers out that were previously cut and tag them the next morning.  White Dep. 104:14-106:24; Dep. Ex. 19, PageID#626 and 20, PageID#627.

48. Burk testified at her deposition that Pennington would cut fruit but not immediately label it with a code date. Burk Dep. 29:6-12; 30:4-31:17.

49. Associate Jesse Newcomb indicated that he made small cups of fruit from larger cups that were already made and on the shelf.  White Dep.  110:13-111:19; 112:7-21; Dep. Ex. 22, PageID#629, and 23, PageID#630.

## Pennington's Return from Leave

50. On February 29, 2016, Pennington returned from FMLA leave. Pennington Dep. 86:7-9.

51. The day Pennington returned from leave, Purinton and Gammon met with him to discuss the alleged violations of the food safety standard practice ("SPTA") involving the cut fruit. Pennington Dep. 28:22-29:3; Purinton Dep. 172:6-173:4; Dep. Ex. 12, PageID#551.

52. During that meeting, Pennington admitted that he sometimes cut fruit at night, stored it overnight on a tray in the refrigerated produce room and then put the fruit out for sale the following day. Pennington Dep. 21:13-21; 26:16-27:4; 78:16-25; 79:16-24.

53. Pennington told Purinton that when he would price the fruit in the morning, he would shorten the code date by a day where he had produced it the day before. Pennington Dep. 29:24-30:3.

54. Pennington's view was that if he had fruit left from the prior day, when he would package the fruit for sale on day two, instead of code dating it so that there would be the day of cutting plus three days to sell the item, he would limit it to two additional days. Pennington Dep. 82:23-83:13.

55. Pennington had trained his associates to do the same thing. Pennington Dep. 83:5-21.

56. In response to a question from Purinton about what his associates were doing, Pennington said that his associates should be dating the cut fruit by taking a day off of it if the fruit was cut on the day before it was actually dated and set out for sale. Pennington Dep. 27:19-28:4.

57. Pennington was fully aware of the standard practice for producing cut fruit. Pennington Dep. 30:10-25; 33:6-34:18.

58. The practice of not code-dating fresh fruit after it had been cut concerned Hannaford management because it could not track, verify or determine whether the fruit that had been labeled later was actually within the authorized and correct code date period (the date the fruit was cut plus three days) and/or that one day had in fact been subtracted from the date that was placed on the product if it was packaged the day after it was cut. Perry Dep. 97:11-100:24, 112:4-113:10; Purinton Dep. 177:14-178:24, 182:1-24, 184:25-185:18, 204:8-13; 214:3-12.

59. Hannaford management was concerned about the risk created by Pennington's deviation from the standard practice as set forth in the SPTA and that Pennington telling staff to subtract a day from the code date when they eventually labeled the fruit was insufficient to ensure that the fruit would have the correct code date. Perry Dep. 99:20-100:24.

60. Hannaford management regarded Pennington's knowing violations of the procedures set forth in the SPTA to be different from and more serious than other violations that occurred due to an oversight or mistake. Perry Dep. 102:1-5; Purinton Dep. 198:23-199:19; 238:14-239:25; Mello Dep. 66:3-14.

61. Hannaford concluded that Pennington intentionally violated the policy requiring that fresh produce be labeled and code dated at the time that it is cut. Perry Dep. 99:4-101:6; 101:25; 102:1-6; 108:12-25; 109:5-111:22; Purinton Dep. 182:2-5; 184:12-20; 203:2-20.

62. Pennington's actions were also viewed as dishonest. Purinton Dep. 238:14-239:25.

63. Perry as the Director of Operations for the District is responsible for making decisions on personnel matters including specifically decisions on discipline for a department manager.  Perry Dep. 32:15-35:16.

64. Perry decided to terminate Pennington's employment because Pennington knowingly and willingly failed to follow the SPTA on cut fruit, he directed his associates in a manner that did not follow the SPTA, and because of the risk that the violation potentially created.  Perry Dep. 101:11-13; 117:4-25.

65. The termination decision was a difficult one for Perry because he knew Pennington very well from the time that he was the manager of the Waldoboro store and he liked him and thought he was a great guy.   Perry Dep. 65:18-67:13; 101:7-19.

66. Ken Kierstead, the Associate Relations Specialist, informed Perry that he would review Perry's termination decision with Associate Relations and the Legal Office before finalizing it.  Perry Dep.  118:8-119:6.

67. Pennington was notified of his termination on March 4, 2016.  Pennington Dep. 36:6-37:10; Dep. Ex. 15, PageID#622.

### Remodel and Expansion of Waldoboro Store

68. The remodel and expansion of the Waldoboro Hannaford began in March 2016 and the grand opening occurred in December 2016.  Purinton Dep. 21:20-22:6.

69. At the time Pennington went out on FMLA leave in December, 2015, the store expansion was still in the planning stage.  Pennington Dep. 39:25-40:7.

70. Purinton asked Pennington sometime between March and May, 2015 if Pennington could handle the new store.  Pennington Dep. 38:18-39:13; 88:12-89:8;  Purinton Dep. 244:19-245:12.

71. Purinton did not have doubts about whether Pennington would be up to the change associated with the store expansion as long as Pennington did not and Pennington said he was ready. Purinton Dep. 245:2-12.

72. Perry and Purinton discussed leadership competencies and qualifications needed at the expanded store at the beginning of the remodel planning process and both felt that Pennington was prepared and qualified to continue as the produce manager in the expanded store. Perry Dep. 76:12-80:6.

73. Pennington relies on Purinton's statement asking if he could handle the store expansion as evidence supporting Pennington's claim that he was fired because of his age, his disability, and his taking leave. Pennington Dep. 38:18-39:13.

74. Pennington also thinks that with his medical problems and his medical leaves that they somehow caused problems for the store and so he thinks he was fired for that. Pennington Dep. 38:18-39:13.

75. Pennington's alleged disability is the combination of injuries for which he has taken leave in the past, including his knee, heart, back, and shoulder. Pennington Dep. 84:13-85:3.

76. Each time Pennington sought leave for treatment of those alleged disabilities, Hannaford granted him leave. Pennington Dep. 85:11-18.

77. Pennington alleges that Hannaford failed to provide him a reasonable accommodation because he was fired after returning from leave and before he could work with the medical restrictions that were imposed for a period of time. Pennington Dep. 86:24-87:10.

78. Pennington alleges that Hannaford violated the FMLA by firing him for taking the last FMLA leave from December, 2015 through February, 2016. Pennington Dep. 87:22-88:8.

79. Pennington did not discuss the manner in which he prepared the fruit with the food safety auditor who visited the store or with the Store Manager or the Assistant Store Manager. Pennington Dep. 80:17-19; 81:20-22; 82:3-12.

80. Pennington believes, however, that they should have seen what he was doing. Pennington Dep. 79:25-82:12.

## Discipline of Other Food Safety Violations

81. Hannaford has terminated other employees for intentional food safety violations:[1]

    a. On April 28, 2014, Hannaford terminated a produce manager for having instructed associates in her department not to perform temperature checks on fresh cut fruit and instead to simply write down on a log an acceptable temperature number. Defendant's Response to Request for Admission No. 21, SR 773-791.

    b. On July 10, 2014, Hannaford terminated a deli service leader for having instructed other associates to enter temperatures in a temperature log for a hot food card that they made up. Defendant's Response to Request for Admission No. 21, SR 890-892.

    c. On July 29, 2014, Hannaford terminated an associate who had entered a temperature on the temperature log for the hot soup even though she

---

[1] Inasmuch as the documents supporting these actions are considered confidential and were filed under seal, the Stipulated Record ("SR") numbers appearing at the bottom of the relevant pages are being referenced until ECF PageID numbers are provided.

14

had not actually checked the temperature. Defendant's Response to Request for Admission No. 21, SR 950-953.

d. On September 30, 2014, Hannaford terminated a meat/seafood manager for having kept an out of date frozen meat product in the freezer to eventually sell to a particular customer. Defendant's Response to Request for Admission No. 21, SR 954-982.

e. On May 4, 2015, Hannaford terminated a meat manager for having instructed an associate to label certain ground beef that had tested as 78% beef as being 80%. Defendant's Response to Request for Admission No. 21, SR 923-940.

f. On September 4, 2015, Hannaford terminated a deli manager for having entered temperatures on a temperature log for a hot food cart that she made up. Defendant's Response to Request for Admission No. 21, SR 874-883.

g. On October 15, 2015, Hannaford terminated a manager trainee for having instructed an associate to put outdated product into the butcher shop. Defendant's Response to Request for Admission No. 21, SR 833-873.

h. On February 8, 2016, Hannaford terminated a deli associate for having recorded temperatures on a refrigerated food products temperature log even though she had not taken the temperatures. Defendant's Response to Request for Admission No. 21, SR 792-832.

    i. On March 27, 2012, Hannaford terminated a meat department manager as a result his actions in brining beef in the meat department. Defendant's Response to Request for Admission No. 21, SR 941-949.

    j. Pennington also had a friend who was fired by Hannaford for regrinding meat about 15 years ago. Pennington Dep. 34:19-35:10.

Dated: February 9, 2018                /s/ Timothy J. O'Brien
                                                 Timothy J. O'Brien, Esq. (Bar No. 3799)
                                                 Attorney for Defendant
                                                 Libby O'Brien Kingsley & Champion, LLC
                                                 62 Portland Road; Suite 17
                                                 Kennebunk, ME  04043
                                                 207-985-1815
                                                 tobrien@lokllc.com

## **CERTIFICATE OF SERVICE**

      I hereby certify that I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which caused a copy of this document to be served electronically on all registered counsel of record including:

Chad T. Hansen
Maine Employee Rights Group
92 Exchange Street 2nd floor
Portland, Maine 04101
chansen@maineemployeerights.com

Dated: February 9, 2018　　　　　　/s/ Timothy J. O'Brien
　　　　　　　　　　　　　　　　　Timothy J. O'Brien, Esq. (Bar No. 3799)
　　　　　　　　　　　　　　　　　Attorney for Defendant
　　　　　　　　　　　　　　　　　Libby O'Brien Kingsley & Champion, LLC
　　　　　　　　　　　　　　　　　62 Portland Road; Suite 17
　　　　　　　　　　　　　　　　　Kennebunk, ME  04043
　　　　　　　　　　　　　　　　　207-985-1815
　　　　　　　　　　　　　　　　　tobrien@lokllc.com