# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| W. TERRENCE PENNINGTON, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|         v. | ) |
| | ) 2:17-cv-00053-JDL |
| HANNAFORD BROS. CO., LLC, | ) |
| | ) |
|     Defendant. | ) |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff W. Terrence Pennington worked for the Defendant Hannaford Bros. Co., LLC ("Hannaford") for over thirty years, including, most recently, as the Produce Manager at Hannaford's store in Waldoboro, Maine. In his Complaint, Pennington claims that Hannaford violated state and federal laws by firing him in March 2016 based on his age and disabilities, and in retaliation for his requesting and taking medical leaves of absence.[1] Hannaford has moved for summary judgment on all counts (ECF No. 41). It argues that Pennington was fired for his knowing violation of Hannaford's food safety rules concerning the packaging and dating of cut fruit. For the reasons that follow, I grant Hannaford's motion as to Pennington's claims for interference under the Family Medical Leave Act and the Maine Family Medical Leave Requirements Law (Counts IX and X, in part), and otherwise deny Hannaford's motion.

---

[1] Specifically, Pennington brings claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.A. § 621, *et seq.* (2018), Americans with Disabilities Act ("ADA"), 42 U.S.C.A. § 12101, *et seq.* (2018), Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551, *et seq.* (2018), Family Medical Leave Act ("FMLA"), 29 U.S.C.A. § 2601, *et seq.* (2018), and Maine Family Medical Leave Requirements Law (MFMLR), 26 M.R.S.A. § 843, *et seq.* (2018).

# I. FACTUAL BACKGROUND

Pennington worked for Hannaford from 1975 to 1986, and again from 1994 to 2016. From 2000 until his termination in 2016, Pennington served as the Produce Manager in Hannaford's Waldoboro store. Pennington also served as the store's Health and Safety Chair and had been referred to by the store manager, Richard Purinton, as a "food safety guru" and as a "great asset" with respect to food and workplace safety. Pennington's performance at Hannaford always met or exceeded expectations prior to the events that led to his termination.

At the time of his termination, Pennington was 58 years old and suffered from heart disease, knee and back impairments, and a shoulder injury. During his employment at Hannaford, Pennington took medical leave on the following occasions: after a heart attack in 1998, to recover from back surgery in 2001, for a knee or hip injury in 2012, and for shoulder impingement syndrome and a rotator cuff tear in 2015. After his return, Pennington continued to have pain in his shoulder and took another medical leave from December 14, 2015, to February 29, 2016, to have surgery. When Pennington returned from the leave in March 2015, Purinton asked him "are you sure you can handle" an upcoming remodeling of the Waldoboro store, which would result in higher sales volume and increased stress for its employees. Pennington said "I'm sure I can, I guess we'll see," or something to that effect.

While Pennington was on his leave for his shoulder surgery, Hannaford became aware of allegations by an employee who worked with Pennington that Pennington had instructed employees to violate Hannaford's fruit packaging and dating policies. Hannaford trains its employees on food handling and safety practices

involving cut fruit by using Standard Practice Training Aids ("SPTA") that provide step-by-step directions. Pursuant to the SPTA, before fresh fruit is put on the sales floor it must be cut, packaged, and labeled with a sell-by date three days after the date it was cut. The allegation against Pennington was that his practice was to refrigerate excess cut fruit overnight and then date the cut fruit and put it on the sales floor the following day without subtracting a day from the sell-by date. Thus, the sell-by date of the fruit was four days from the date the fruit was cut.

While Pennington was still on medical leave, Hannaford initiated an investigation into his compliance with company policies. As part of the investigation, Store Manager Purinton and Assistant Store Manager Kristen White interviewed and obtained written statements from five employees in the produce department. Of the five employees, only one stated that Pennington had trained or instructed her to date fruit improperly. The remaining employees indicated that they knew to date fruit three days from when it was cut, and not from when it was put on the sales floor.

Pennington returned from FMLA leave on February 29, 2016. That day, Purinton and Hannaford's associate relations manager met with him to discuss his alleged violations of the SPTA requirements for cut fruit. During the meeting, Pennington admitted that he sometimes cut fruit at night, stored it overnight on a tray in the refrigerated produce room, and then put the fruit out for sale the following morning. Pennington also stated that when he would label the fruit in the morning, he would shorten the sell-by date by a day so that the sell-by date was three days from when the fruit was cut, as required by the SPTA.

Hannaford has a progressive employee discipline policy that provides for skipping disciplinary steps only in cases of "serious misconduct." Hannaford's Food Safety and Defense Policy, meanwhile, provides for termination of an employee's employment only in the event of a willful violation of the policy: "[A] willful violation of [the policy is] considered to be gross misconduct sufficient for discharge without warning . . . ." ECF No. 53 at ¶ 149.

There is a factual dispute as to whether Purinton asked Pennington during their meeting if he knew that his approach to cut fruit violated Hannaford's policy. At his deposition, Purinton testified that Pennington admitted that he knowingly violated the SPTA in response to a direct question. ECF No. 36-3 at 48-49 ("Q: [Pennington] said, I know the right way to do it, but I've been doing it the wrong way? A: Correct."). Pennington, meanwhile, asserted in an affidavit and at his deposition that at no point during the meeting on February 29, 2016, or any other time, did anyone ask him whether he believed his manner of handling cut fruit complied with the SPTA. ECF No. 47-1 at ¶ 10; ECF No. 36 at 9-10. The associate relations manager who was present at the February 29 meeting likewise testified at her deposition that she did not recall Pennington admitting at the meeting that he believed the way he cut and labeled fruit was wrong. ECF No. 37 at 13.

Hannaford admits for the purposes of summary judgment that had anyone asked Pennington whether he believed his manner of handling cut fruit complied with the SPTA, he would have honestly said yes, ECF No. 53 at ¶ 128. Hannaford further asserts as a disputed fact that Purinton concluded that Pennington deserved immediate termination without progressive discipline because Pennington had

4

admitted that he knew he was violating company policies. He reported the same to Director of Operations, Thomas Perry. Relying on the information provided by Purinton, Perry decided to terminate Pennington effective March 4, 2016. Perry testified at his deposition that his decision was based on Pennington "intentionally and willingly breaking standard practice." ECF No. 36-3 at 20. Perry also testified that if Pennington had instead believed that he was in compliance with standard practices, that fact may have affected Perry's decision to terminate Pennington. Hannaford never sought a written statement from Pennington during the course of its investigation, although that is its practice in disciplinary investigations. ECF No. 53 at ¶¶ 118, 123.

## II. LEGAL ANALYSIS

Summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if "its existence or nonexistence has the potential to change the outcome of the suit." *Rando v. Leonard*, 826 F.3d 553, 556 (1st Cir. 2016) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)). Issues are considered genuine "if the evidence of record permits a rational factfinder to resolve [the issue] in favor of either party. . . ." *Id.* (quoting *Borges*, 605 F.3d at 4). The facts in the record are construed in the light most favorable to the nonmoving party and all reasonable inferences are resolved in the nonmoving party's favor. *See Braga v. Genlyte Grp., Inc.*, 420 F.3d 35, 38 (1st Cir. 2005).

Hannaford contends that all of Pennington's claims are subject to the *McDonnell Douglas* burden-shifting framework. The *McDonnell Douglas* framework contains three parts: First, Pennington must establish a *prima facie* case with respect to each claim. *Lang v. Wal-Mart Stores E., L.P.*, 813 F.3d 447, 457 (1st Cir. 2016). Then, Hannaford has the opportunity to offer a legitimate, non-discriminatory reason for its complained-about action. *Id.* at 457. Finally, Pennington must show that Hannaford's proffered nondiscriminatory reason is pretextual. *Id.* For the purposes of summary judgment, Hannaford concedes that Pennington has established a *prima facie* case for all of his claims. ECF No. 41 at 7. Having asserted a non-discriminatory reason for terminating Pennington – violation of food safety rules – Hannaford argues that the case hinges on pretext. I conclude that (A) there is a triable issue as to whether Hannaford's stated reason for terminating Pennington was pretextual.[2] I further conclude that (B) Pennington's claims for interference under the FMLA and MFMLR are redundant with respect to his retaliation claims under those same statutes and subject to summary judgment on that basis.

**A. Pretext**

Hannaford based its decision to terminate Pennington on his purported knowing and intentional violation of food safety rules. ECF No. 41 at 1. Critically, however, there are disputes of fact as to whether Pennington ever admitted to knowingly violating Hannaford procedure and whether he was even asked if he knew he was violating its policy. Furthermore, Hannaford concedes that had he been

---

[2] The parties dispute which analytical framework applies to several of Pennington's claims for the purpose of summary judgment. However, because Hannaford concedes that each of Pennington's claims rest on the issue of pretext under *McDonnell Douglas*, and because I find that there is a triable issue as to that issue, I do not resolve this dispute.

asked, Pennington would have stated honestly that he believed he was complying with the company's standard practices. The record also indicates that Pennington, who was known as a "food safety guru," had engaged in the contested conduct – labeling the fruit the day after it was cut – for years, although there is a factual dispute whether Hannaford was aware of this practice and tacitly condoned it.[3]

Based on Pennington's disputed admission of having violated the food safety rules, Hannaford bypassed progressive discipline and immediately terminated his employment. In so doing, Hannaford failed to obtain a written statement from Pennington in violation of company practice. Hannaford's deviation from its established policy or practice is evidence of pretext. *See Brennan v. GTE Gov't Sys. Corp.*, 150 F.3d 21, 29 (1st Cir. 1998).

In a similar vein, there is evidence in the record that Pennington's termination was extraordinary. Purinton testified that he could not remember a manager, such as Pennington, being terminated for failing to follow company policies, including produce dating policies. Wayne Mello, a Food Safety Specialist for Hannaford since 2007, meanwhile, testified that he was not aware of any employee being disciplined for food safety violations, even when stores had repeated critical food safety violations. Furthermore, the one employee who admitted to Purinton that she cut and labeled fruit the way Pennington instructed her to, despite knowing it "wasn't the right way to do it," was not disciplined. ECF No. 53 at ¶¶ 102-03. *See Mesnick v.*

---

[3] There is a further dispute as to whether the conduct Pennington admitted to – date labeling fruit the day after it was cut – is even a violation of the SPTA. The SPTA, themselves, are silent as to how much time can lapse between when fruit is cut and labeled. *See, e.g.*, ECF No. 37-5. Hannaford contends, however, that the steps provided in the SPTA create a tacit understanding that labeling must occur immediately after cutting. ECF No. 36-2 at 19.

*Gen. Elec. Co.*, 950 F.2d 816, 828 (1st Cir. 1991) (evidence of differential treatment is circumstantial evidence of discrimination).

There is also evidence in the record from which a fact-finder could reasonably infer that there was discriminatory animus by management. At the time of his termination, Pennington was 58 years old, suffered from multiple disabilities, and had taken over three months of medical leave during the previous year. The Waldoboro store was undergoing a major remodeling which was expected to be stressful for its employees because it would substantially increase the store's size and sales volume. Hannaford admits that Purinton asked Pennington if he was sure he could "handle" the remodeling, though the parties dispute whether Purinton asked other managers the same or similar question. A fact-finder could reasonably interpret Purinton's question as suggesting his concern about Pennington's ability to perform his job because of his age and medical condition.

On the basis of the above evidence in the summary judgment record, which includes a disputed admission of guilt and possible procedural irregularities and differential treatment, a reasonable fact-finder could conclude that Hannaford's stated reason for terminating Pennington was pretextual. I therefore deny Hannaford's motion as to Counts I through VIII in their entirety, and as to Counts IX and X on the basis of FMLA and MFMLR retaliation.

**B.    FMLA and MFMLR Interference**

Under the FMLA, an employee may allege interference with substantive rights or bring suit against an employer under a retaliation theory. *See Colburn v. Parker*

*Hannifin/Nichols Portland Div.*, 429 F.3d 325, 331 (1st Cir. 2005).[4] Hannaford argues that Pennington's claims for interference with his substantive FMLA rights is a disguised claim for retaliation and must therefore be analyzed as one. "[W]hether a claim is characterized as 'interference' or not, its elements actually differ depending on whether the plaintiff is, at bottom, claiming that the employer denied his or her substantive rights under the FMLA or that the employer retaliated against him or her for having exercised or attempted to exercise those rights . . . ." *Id.* at 331-32. Where, as here, "termination is the adverse action that [a] plaintiff contends constituted both interference with and retaliation against the exercise of her FMLA rights," the interference claim is redundant of the retaliation claim. *Chacon v. Brigham and Women's Hosp.*, 99 F. Supp. 3d 207, 214 (D. Mass. 2015) (dismissing count for interference under the FMLA). Therefore, to the extent Counts IX and X allege interference with substantive rights, summary judgment is granted as to those counts.

### III. CONCLUSION

For the foregoing reasons, Hannaford's Motion for Summary Judgment (ECF No. 41) is **GRANTED IN PART** as to Pennington's claims for interference under the Family Medical Leave Act and the Maine Family Medical Leave Requirements Law (Counts IX and X, in part) and otherwise **DENIED**.

**SO ORDERED.** Dated this 7th day of June, 2018.

/s/ JON D. LEVY
**U.S. DISTRICT JUDGE**

---

[4] I treat the MFMLR claims as coextensive with the FMLA claims. *See Brown v. Hartt Transp. Sys., Inc.*, 725 F. Supp. 2d 210, 229 (D. Me. 2010).